A00A2436. SKIPPER SAMS, INC. v. ROSWELL-HOLCOMB
ASSOCIATES, LTD. et al.
(543 SE2d 765)

ELDRIDGE, Judge.

Plaintiff-appellant Skipper Sams, Inc. ("Skipper Sams") appeals from the trial court's grant of summary judgment to defendants-

---

appellees Roswell-Holcomb Associates, Ltd., Ben F. Kushner, and James Bader (collectively "Roswell-Holcomb") on Skipper Sams' contract action seeking recovery for alleged fraud, negligent misrepresentation, and breach of contract. After conducting a de novo review of the trial court's judgment, it is affirmed.

Viewing the evidence and all inferences drawn therefrom in a light most favorable to nonmovant Skipper Sams,[1] the record shows that Robert Weinberg, Sam Weinberg, and Fred Weinberg (the "Weinbergs") expressed interest in assuming a lease from George Sarris ("Lease") for a restaurant that Sarris operated out of Crossville Village Shopping Center ("shopping center") in Roswell.[2] Roswell-Holcomb is the landlord of the shopping center, and it employs as its leasing agent Ben F. Kushner Company, Inc. ("leasing company"). Kushner is a general partner of Roswell-Holcomb, as well as an employee of the leasing company. Bader was also employed by the leasing company.

While negotiating with Sarris on a purchase price for the restaurant, the Weinbergs also met twice with Bader and/or Kushner between the middle of August and the end of September 1991 in order to discuss assuming Sarris' Lease. At the meetings, Bader and/or Kushner told the Weinbergs: (1) that Roswell-Holcomb had signed a lease with TGI Fridays ("Fridays") to open a restaurant in the shopping center;[3] (2) that Roswell-Holcomb would then renovate the shopping center to provide a new, updated facade; (3) that Roswell-Holcomb would then erect a large new pylon sign near the highway; and (4) that currently Roswell-Holcomb was "working" on obtaining a major, national tenant to move into the shopping center's vacant anchor space (hereinafter referred to as "the four representations"). The Weinbergs were told that "as soon as they would start construction for Fridays, that's when everything else was going to happen." At both these meetings, the Weinbergs made it clear to Roswell-Holcomb that, "in the event the parties contract with each other," the Weinbergs would organize and charter a corporation to be called "Skipper Sams, Inc." and that Skipper Sams would be the party assuming the Lease.

Thereafter, the Weinbergs continued negotiations with Sarris in order to reduce the price of his restaurant. The Weinbergs did not mention Fridays to Sarris because they "didn't want him to know

---

[1] *Rubin v. Cello Corp.*, 235 Ga. App. 250, 251 (510 SE2d 541) (1998).

[2] The original tenant of the premises was Leo Efstathiou, a/k/a Leo Stathis, who signed the original lease on August 1, 1987; he assigned the lease to Sarris in connection with the operation of Sarris' restaurant, the Roswell Diner, on the premises.

[3] It is undisputed that at the time of the meetings, Fridays had, in fact, signed a lease with Roswell-Holcomb to open a restaurant in the shopping center, such lease having been signed on August 15, 1991.

that [they] knew it"; they were "trying to get his price down." Finally, Sarris and the Weinbergs reached a price which was acceptable to both parties, and on October 30, 1991, they entered into a purchase agreement.

On November 1, 1991, the Weinbergs chartered and incorporated Skipper Sams. Later that same day, November 1, 1991, Roswell-Holcomb, Sarris, and Skipper Sams entered into a consent agreement assigning the Lease to Skipper Sams. The consent agreement specifically states that

> this Consent does not constitute recognition of any deviations, alterations or substitutions from the terms and conditions of the Lease. The terms, conditions and covenants contained in the Assignment of Lease are subordinate in all respects to those contained in the Lease. . . . The consent to the assignment herein by Landlord shall not be deemed a waiver of any provisions of the Lease.

In that respect, the Lease contains a merger clause which states

> [t]his Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, lease proposals, brochures, representations, and information conveyed, whether oral or in writing between the parties hereto or their respective representatives or any other person purporting to represent Landlord or Tenant. The Tenant acknowledges that it has not been induced to enter into this Lease by any representations not set forth in this Lease. It has not relied on any such representations, no such representations shall be used in the interpretation or construction of this Lease, and Landlord shall have no liability for any consequences arising as a result of any such representations.

Skipper Sams acknowledged that it would be bound by all the terms and conditions of the Lease. In addition, Skipper Sams agreed it would not include a lounge area in the seafood restaurant so as not to compete with Fridays' type of operation. Also on November 1, 1991, Skipper Sams closed on the purchase of Sarris' restaurant, with a purchase price of $45,000.

In the middle of January 1992, Skipper Sams opened a seafood restaurant in the shopping center. Approximately two months later, in March or April 1992, Skipper Sams was informed by Roswell-Holcomb that the lease agreement with Fridays had failed because certain contingencies contained therein were not met. Thus, plans were scrapped to renovate the facade on the shopping center and to

erect the pylon sign. In addition, Roswell-Holcomb had been unable to rent the anchor space to a major, national tenant.

Despite being informed of the failure of the four representations, Skipper Sams did not seek to rescind the Lease but, instead, "kept operating" and "kept trying to make the business profitable." Although improvements were not made to the shopping center, Skipper Sams' restaurant "experienced satisfactory growth for eight or ten months after opening." During this time, however, numerous nationally franchised restaurants began to open in the general area of the shopping center, i.e., Macaroni Grill, Brookwood Grill, Olive Garden, and Black-Eyed Pea. Also, the Mansell Road exit off Highway 400 opened, causing a significant decrease in traffic in front of the shopping center. In order to compete and "attract more customers," Skipper Sams renovated the restaurant, putting in a large lounge area in order to "convert it into more of a 'cocktail bar' operation," as Fridays would have been. In addition, Skipper Sams put in a large screen television and a new five-ton, roof-top air conditioning unit. Apparently, however, business did not boom.

On January 22, 1993, Skipper Sams sent Roswell-Holcomb a letter requesting a reduction in rent under the Lease because Roswell-Holcomb did "not tell[ ] the truth" about its lease with Fridays. Skipper Sams did not seek to rescind the Lease, but sought to lower the rent to five percent of net sales. In this letter, Skipper Sams maintained that "[w]hen TGI Fridays or an equivalent national restaurant and bar opens on this property, and when the renovation is completed, and when national tenants occupy the [anchor] space, then we will pay the rent as per the lease, beginning that month." Replying immediately, Roswell-Holcomb refused to reduce the rent. Skipper Sams continued to operate for another year. It closed the restaurant in December 1993, at which time Skipper Sams ceased paying rent under the Lease.

Immediately thereafter, Skipper Sams sold its business and assets to Chatham Gourmet for $65,000 and entered into a consent agreement with Roswell-Holcomb and Chatham Gourmet to assign the Lease. Chatham Gourmet defaulted in their agreement with Skipper Sams, and Skipper Sams repossessed the business. Shortly thereafter, Skipper Sams again sold the business to Table for Two for $65,000 and again entered into a consent agreement with Roswell-Holcomb and the new owner to assign the Lease. In the consent agreements with both Chatham Gourmet and Table for Two, Skipper Sams asserted that there was "no existing default under the Lease."

Table for Two then defaulted on its agreement with Skipper Sams, and Skipper Sams again repossessed the business. Meanwhile, Roswell-Holcomb had received rent under the Lease only sporadically since December 1993 and thus directed Skipper Sams to

vacate the leased premises. Skipper Sams sold off the restaurant assets and vacated the premises.

Thereafter, on August 10, 1994, Skipper Sams filed the instant action, claiming (1) fraud, in that the four representations by Roswell-Holcomb were false and fraudulent and were made in order to induce Skipper Sams to enter into an agreement for the assignment of the Lease; and (2) breach of contract, in that the four representations allegedly constituted material parts of a contract or agreement between the parties, separate from the Lease, which separate agreement was breached when the four representations did not occur. Skipper Sams sought damages for lost expenses, punitives, and attorney fees. The complaint was later amended to include a claim of negligent misrepresentation.

Roswell-Holcomb cross-claimed for back due rent, late fees, and attorney fees. Pursuant to Roswell-Holcomb's subsequent motion for summary judgment as to the complaint and cross-claim, the trial court issued an order granting same. Skipper Sams appeals from this order. *Held*:

1. The trial court determined that Skipper Sams lacks standing to bring the instant action because the four representations that are the crux of the complaint were made to the Weinbergs before Skipper Sams was in existence. We agree.

The four representations were made during the two meetings between Roswell-Holcomb and the Weinbergs in August and September 1991, and it is undisputed that Skipper Sams was not incorporated until over a month later, on November 1, 1991. Since Skipper Sams was nonexistent at the time of the August/September meetings, it could not have relied upon Roswell-Holcomb's four representations so as to sustain an action for fraud or negligent misrepresentation. Nor could a nonexistent corporation have reached a contractual agreement with Roswell-Holcomb at the time of the August/September meetings so as to sustain an action for breach of contract based on the four representations.

Skipper Sams contends, however, that Roswell-Holcomb is estopped from denying its corporate existence because during the August/September meetings Roswell-Holcomb knew that Skipper Sams, not the Weinbergs, would be assuming Sarris' Lease. "The general rule in this state is that a person who contracts or deals with a corporation as such will be estopped to deny its corporate existence in an action arising out of or involving the contract."[4]

However, the above principle has no application here. While the Weinbergs did inform Roswell-Holcomb during the August/Septem-

---

[4] *Cahoon v. Ward*, 231 Ga. 872, 873 (1) (204 SE2d 622) (1974). See OCGA § 14-5-4.

ber meetings that they intended to form Skipper Sams in order to assume the Lease, the record is clear that such corporate formation was only *if* the Lease was to be assumed at all. During the August/ September meetings, it was not at all certain that the Lease would be assumed, and so it was not at all certain that Skipper Sams would ever come into existence. The corporate formation of Skipper Sams was contingent upon the Weinbergs' personal decision to assume the Lease, and that decision was contingent upon the Weinbergs' personal negotiations with Sarris for the purchase of his business. "[W]here an individual purports to act for a non-existent corporation, the doctrine of corporation by estoppel will not be applied."[5] The four representations may have persuaded the Weinbergs to continue their negotiations with Sarris and may even have played a part in the Weinbergs' personal decision to go forward with the formation of Skipper Sams and ultimately assume the Lease, but it cannot be said that, at the time the representations were made, Roswell-Holcomb knew at all times it was dealing with the Weinbergs as "agents" of a corporation the formation of which had yet to be decided upon. Accordingly, Skipper Sams does not have standing to bring the instant action.

2. A party claiming it was fraudulently induced to enter a contract has two possible remedies: (1) to promptly rescind the contract after discovering the fraud and sue in tort for the recovery of the contract's consideration, as well as any other damages resulting from the fraud; or (2) affirm the contract and sue for damages resulting from the contract.

> Where the party elects the second option and affirms the contract, however, he or she is bound by its terms. . . . [And] the contract's merger provision would estop a party bound by the terms of the contract from arguing that he or she relied on representations other than those contained in the contract.[6]

With these general principles in mind, it is clear that the Weinbergs never attempted to rescind the Lease at issue, but affirmed such by continuing to exercise their rights under the Lease, i.e., occupying the premises; operating the restaurant; improving the subject property; and paying rent.[7] Thereafter, they represented to

---

[5] *Goodwyne v. Moore*, 170 Ga. App. 305, 307 (316 SE2d 601) (1984); *Don Swann Sales Corp. v. Echols*, 160 Ga. App. 539, 541 (287 SE2d 577) (1981).

[6] (Citations and punctuation omitted.) *Estate of Sam Farkas v. Clark*, 238 Ga. App. 115, 117-118 (1) (517 SE2d 826) (1999).

[7] See *Allen Housemovers v. Allen*, 135 Ga. App. 837, 839 (1) (219 SE2d 489) (1975).

subsequent assignees that there existed no default under the Lease. Thus, any claims that sound in tort must fail.

As to the breach of contract claim, the parties are bound by the terms of the Lease pursuant to the plain language of the consent to the assignment of the Lease agreement. The Lease includes a merger clause which specifically states that the Lease supersedes and revokes all previous negotiations and that Skipper Sams was not induced to enter into the Lease by any representations not set forth therein. The Weinbergs acknowledged such. Thus, any contentions regarding the breach of a separate, oral agreement consisting of the four representations must also fail.[8]

3. Skipper Sams also claims error in the trial court's grant of summary judgment to Roswell-Holcomb on its counterclaim. Our decision in Divisions 1 and 2 renders this contention meritless.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED DECEMBER 8, 2000.

*Curtis R. Richardson*, for appellant.

*Bodker, Ramsey & Andrews, Robert D. Wildstein, Arnall, Golden & Gregory, Ann S. Infinger*, for appellees.

---

[8] *Southern Prestige Homes v. Moscoso*, 243 Ga. App. 412, 416 (532 SE2d 122) (2000).